54 So.3d 909 (2010)
Joseph GRACE
v.
STANDARD FURNITURE MANUFACTURING COMPANY, INC.
2090111.
Court of Civil Appeals of Alabama.
July 23, 2010.
*910 Charles R. Godwin, Timothy J. Godwin, and Gordon B. Godwin, Atmore, for appellant.
Robert G. Jackson, Jr., Anthony M. Hoffman, and Jennifer S. Holifield of Zieman, Speegle, Jackson & Hoffman, L.L.C., Mobile, for appellee.
PER CURIAM.
Joseph Grace has been employed by Standard Furniture Manufacturing Company, Inc. ("Standard"), in various positions *911 for 16 years. On November 8, 2005, while working as a forklift operator, Grace was injured when he was hit by a forklift. Grace injured his neck and left shoulder; he also suffered a concussion. After treatment in the emergency room on the day of the accident, Grace sought treatment for his injuries from a company-approved physician, Dr. Gary Kolb, from his personal physician, Dr. James R. Dixon, and from a company-approved orthopedic surgeon, Dr. William A. Crotwell III.
Dr. Crotwell diagnosed Grace with cervical degenerative disk disease, cervical radiculopathy, impingement syndrome of the left shoulder, and arthritis of the left shoulder. According to Dr. Crotwell, a November 2005 MRI performed on Grace's shoulder was of poor quality; Dr. Crotwell said that, although he noticed joint arthritis on that MRI, he did not see any tears or other acute injuries indicated on that MRI. However, a March 2006 MRI revealed a partial tear in Grace's rotator cuff and a possible labrum tear. Dr. Crotwell performed surgery on Grace's shoulder in April 2006; he repaired the tears in the rotator cuff and in the labrum at that time.
According to Dr. Crotwell, the arthritic changes in Grace's neck, which included bone spurs, or osteophytes, and multiple levels of collapsed degenerative disks, were preexisting conditions not caused by Grace's work-related accident. Grace also has a congenital defect in his shoulder; Dr. Crotwell explained that Grace's acromion, a bone forming a portion of the shoulder joint, was "sloping" and could have rubbed against Grace's rotator cuff, causing irritation. Dr. Crotwell also referred to the irritation in Grace's shoulder as resulting from a bone spur. According to Dr. Crotwell, he could not tell whether the rotator-cuff tear that he repaired in April 2006 had resulted from the November 2005 injury or whether it had resulted from irritation by the bone spur before or after the November 2005 work-related injury to the shoulder. Dr. Crotwell did testify that "if you get an injury on top of [a preexisting bone spur] then it is an aggravation to it." In the April 2006 surgery, Dr. Crotwell also trimmed the acromion to alleviate any irritation it might have been causing.
After Grace reached maximum medical improvement regarding both his neck injury and his shoulder injury, Dr. Crotwell assigned Grace physical-impairment ratings. Dr. Crotwell explained that Grace had a 3% loss of motion in his shoulder and that he had a 10% physical impairment to his upper extremity as a result of his shoulder surgery. According to Dr. Crotwell, however, 5% of Grace's 10% physical impairment was caused by his preexisting arthritis and defective acromion; thus, Dr. Crotwell ultimately assigned Grace an 8% physical impairment to his upper extremity resulting from his work-related shoulder injury, which translated, he said, to a 5% physical impairment to the body as a whole.
Grace's neck injury also resulted in permanent physical impairment. Dr. Crotwell explained that Grace suffered a 6% physical impairment to the body as a whole as a result of the condition of his neck. Dr. Crotwell noted that 4% of Grace's neck impairment resulted from Grace's preexisting degenerative disk disease; thus, Dr. Crotwell assigned only a 2% physical impairment to Grace as a whole as a result of his work-related neck injury.
When all of the physical-impairment ratings are combined, Dr. Crotwell explained, Grace suffered a 14% physical impairment to the body as a whole if his preexisting conditions are included. However, when those preexisting conditions are excluded *912 from the calculations, said Dr. Crotwell, Grace's physical-impairment rating is only 7% to the body as a whole.
Dr. Crotwell placed Grace under permanent restrictions as a result of his work-related injuries. Grace is limited to lifting 15 to 20 pounds frequently and 25 to 30 pounds infrequently. He is not permitted to perform overhead work with his left arm, and he is not permitted to perform any work above chest height. In addition, Grace must avoid excessive bending, twisting, and torquing with his neck.
Grace's restrictions prevented him from resuming his position as a forklift operator, which requires heavy lifting on a regular basis. When Grace first returned to work after his injury, he was assigned a position bagging hardware. He was later reassigned to an assembly-line position where he placed "U channels" on the bottom of dressers. Grace testified that his position on the assembly line was within his restrictions. According to Grace, at the time of trial in September 2008, he earned $.15 per hour more in his position on the assembly line than he had as a forklift operator in November 2005. A pay stub admitted into evidence at trial showed that Grace earned $446 per week. The parties agreed that Grace's average weekly wage at the time of his accident was $424.
Grace filed an action against Standard, seeking workers' compensation benefits for the injuries resulting from the November 2005 accident. The trial court entered a judgment in favor of Standard on October 15, 2008, and Grace appealed. This court reversed the trial court's October 2008 judgment because it failed to contain findings of facts and conclusions of law as required by Ala.Code 1975, § 25-5-88. Grace v. Standard Furniture Mfg. Co., 29 So.3d 918 (Ala.Civ.App.2009). On remand, the trial court entered a judgment in compliance with § 25-5-88, and Grace again appealed.[1]
Our review of this case is governed by the Workers' Compensation Act, Ala. Code 1975, § 25-5-1 et seq., which states in pertinent part: "In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence." Ala. Code 1975, § 25-5-81(e)(2). Therefore, this court "will view the facts in the light most favorable to the findings of the trial court." Whitsett v. BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ.App.1994), overruled on other grounds, Ex parte Trinity Indus., Inc., 680 So.2d 262, 269 (Ala. 1996). Further, a trial court's finding of fact is supported by substantial evidence if it is "supported by `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Ex parte Trinity Indus., 680 So.2d at 269 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989), and citing Ala. Code 1975, § 12-21-12(d)). Our review of legal issues is without a presumption of correctness. Ala.Code 1975, § 25-5-81(e)(1); see also Ex parte Trinity Indus., 680 So.2d at 268.
*913 As a preliminary matter, we will address the parties' arguments concerning whether Grace's counsel had stipulated that Ala.Code 1975, § 25-5-57(a)(3)i., known as the "return-to-work statute," applies in the present case. In Grace, Standard argued that the trial court's judgment, which contained not one finding of fact or conclusion of law, was merely meager and omissive because Grace's counsel had stipulated that the only issue was whether the return-to-work statute applied to limit Grace's receipt of benefits. In our opinion concluding that the judgment was not merely meager and omissive and required reversal under § 25-5-88, we explained that the record did not contain a stipulation by Grace's counsel that the only issue before the trial court was whether the return-to-work statute applied to Grace; in fact, we stated that "[t]he record is devoid of any stipulations by Grace's counsel." Grace, 29 So.3d at 920.
Because the trial court's subsequent judgment states that the parties stipulated that § 25-5-57(a)(3)i. controlled, the parties again argue whether a stipulation to that effect was entered on the record. "`"Under the doctrine of the `law of the case,' whatever is once established between the same parties in the same case continues to be the law of that case, whether or not correct on general principles, so long as the facts on which the decision was predicated continue to be the facts of the case."'" McMorrough v. McMorrough, 930 So.2d 511, 514 (Ala.Civ.App.2005) (quoting Stephens v. Stephens, 699 So.2d 194, 196 (Ala.Civ.App.1997) (quoting in turn Blumberg v. Touche Ross & Co., 514 So.2d 922, 924 (Ala.1987))). Thus, we will not consider again whether a stipulation regarding § 25-5-57(a)(3)i. exists in this case. The trial court's judgment on remand further states that it independently concluded that the statute was applicable. We will review that conclusion on appeal.
Because Grace suffered injuries to nonscheduled members of the body, i.e., his neck and shoulder, the compensation due him would ordinarily be based upon his loss of earning capacity. Ala.Code 1975, § 25-5-57(a)(3)g. However, Standard argued below that, based on the fact that Grace's testimony established that he had returned to work at a higher rate of pay, Ala.Code 1975, § 25-5-57(a)(3)i., or the return-to-work statute, applied, resulting in a presumption that Grace had not suffered a loss of earning capacity. Section 25-5-57(a)(3)i. reads, in pertinent part:
"Return to Work. If, on or after the date of maximum medical improvement, except for scheduled injuries as provided in Section 25-5-57(a)(3), an injured worker returns to work at a wage equal to or greater than the worker's pre-injury wage, the worker's permanent partial disability rating shall be equal to his or her physical impairment and the court shall not consider any evidence of vocational disability."
This court has held that the return-to-work statute creates a rebuttable presumption that an employee who returns to work earning the same or a greater wage suffered no loss of earning capacity. Lanthrip v. Wal-Mart Stores, Inc., 864 So.2d 1079, 1082 (Ala.Civ.App.2002); Pemco Aeroplex v. Moore, 775 So.2d 215 (Ala.Civ. App.1999); and Discovery Zone v. Waters, 753 So.2d 515, 517 (Ala.Civ.App.1999). In those cases, we explained that an employee may rebut the presumption by establishing that the employee truly suffers from incapacity or that the employee's higher post-injury wages are an unreliable indicator of his or her earning capacity. See, e.g., Discovery Zone, 753 So.2d at 517 (quoting Johnson v. Alabama Power Co., 670 So.2d 39, 41-42 (Ala.Civ.App.1993)). However, *914 in applying the return-to-work statute in Discovery Zone, Pemco Aeroplex, and Lanthrip, this court applied caselaw that predated the enactment of the statute.
Before 1992, when the return-to-work statute was enacted, see Ala. Acts 1992, Act No. 92-537, § 17, Alabama caselaw held that, when an injured employee returned to work earning the same or higher wages, those facts raised a presumption that the employee had not sustained a loss of earning capacity, which presumption could be rebutted by evidence independently showing incapacity or explaining away the post-injury earnings as an unreliable indicator of earning capacity. See, e.g., Goodyear Tire & Rubber Co. v. Downey, 266 Ala. 344, 96 So.2d 278 (1957); and United States Steel Mining Co. v. Riddle, 627 So.2d 455 (Ala.Civ.App.1993) (applying pre-1992 law). Because caselaw allowed the presumption to be easily rebutted, injured employees routinely received compensation for loss of earning capacity despite having experienced no actual wage loss. See 1 Terry A. Moore, Alabama Workers' Compensation §§ 13:40-13:51 (1998). Apparently, the legislature concluded that the caselaw allowing employees to receive compensation based on loss of earning capacity, despite the fact that their injuries did not immediately result in reduced wages, should be superseded. In order to limit compensation in cases in which an injured employee returns to work earning the same or higher wages following a permanent nonscheduled injury, the legislature resolved that, in such cases, the employee's degree of physical impairment, and not his or her loss of earning capacity, should be the measure for compensation. See T. Moore, supra, at § 13:51. Any reading of the return-to-work statute that restores the applicability of caselaw regarding the presumption of a loss of earning capacity created by an employee's returning to work earning the same or higher wages would be totally inapposite to the purpose of the statute. See Ala. Acts 1992, Act No. 92-357, § 1 (requiring workers' compensation laws to be construed to effect their purposes).
The return-to-work statute does not create any presumption that an employee has not sustained a loss of earning capacity. Rather, the return-to-work statute conclusively states that, when an employee returns to work after reaching maximum medical improvement and the employee is earning the same or higher wages, loss of earning capacity shall not be considered in assessing the compensation due the employee for any permanent disability.[2] Upon concluding that the return-to-work statute governs the amount of compensation due, a trial court need not undergo any analysis to determine whether an employee's post-maximum-medical-improvement earnings reliably indicate the earning capacity of the employee because earning capacity is not even at issue. To the extent that Discovery Zone, Pemco Aeroplex, and Lanthrip construe the return-to-work statute incorrectly by applying pre-statute caselaw indicating that a return to work at the same or a higher wage creates only a presumption that the employee has suffered no loss of earning capacity, those cases are overruled.
Because the return-to-work statute does not create a rebuttable presumption that an employee who returns to work at the same or a higher wage has not sustained a loss of earning capacity, we need *915 not consider whether Grace presented sufficient evidence to rebut the nonexistent presumption. We will, however, consider whether, as Grace argues, the trial court compared the wrong wage to conclude that his post-injury wages were higher than his pre-injury wages. Grace says that the trial court should have considered the wage that Grace was first paid when he returned to work after his injury. However, Grace presented the only evidence of his post-injury wages, and he chose to present evidence of his wage at the time of trial. Thus, even assuming that the trial court erred by using the wage Grace was earning at the time of trial, Grace led the trial court into that error by providing to the trial court evidence of only the wage he was earning at the time of trial for comparison with his pre-injury wage under the return-to-work statute. See Mobile Infirmary Med. Ctr. v. Hodgen, 884 So.2d 801, 808 (Ala.2003) ("The law is well settled that a party may not induce an error by the trial court and then attempt to win a reversal based on that error.").
We cannot conclude that the trial court erred in determining that Grace returned to work at a higher wage than the wage he had earned before his injury. The evidence at trial established that Grace earned $.15 per hour more as an assembly-line worker than he had as a forklift operator. Thus, the trial court's conclusion that the return-to-work statute precluded consideration of any vocational disability was supported by substantial evidence. We therefore affirm the trial court's judgment insofar as it determined that § 25-5-57(a)(3)i. applied to prohibit Grace from presenting evidence of vocational disability.
Grace also argues that the trial court erred by determining his disability rating to be 7%, which was the exact physical-impairment rating assigned by Dr. Crotwell after Dr. Crotwell discounted any physical impairment resulting from Grace's preexisting neck and shoulder conditions. According to Grace, the trial court was not bound by Dr. Crotwell's physical-impairment rating; we agree. See Drummond Co. v. Key, 854 So.2d 1159, 1163 (Ala.Civ.App.2002) ("It is the duty of the trial court to review all of the evidence, including its own observations, in determining the extent of the disability."); Compass Bank v. Glidewell, 685 So.2d 739, 741 (Ala.Civ.App.1996) ("It is well settled that the trial court has the duty to determine the extent of disability and is not bound by expert testimony in making that determination; yet, in making its determination, the trial court must consider all the evidence, including its own observations, and it must interpret the evidence to its own best judgment."). However valid, that principle is not necessarily helpful to Grace's argument.
Grace further relies on Ala.Code 1975, § 25-5-58, and the cases construing it. See T. Moore, supra, at § 16.25 (explaining the judicial construction of § 25-5-58). Section 25-5-58 permits the apportionment of disability between disability caused by a work-related accident and disability resulting from preexisting conditions. That statute provides:
"If the degree or duration of disability resulting from an accident is increased or prolonged because of a preexisting injury or infirmity, the employer shall be liable only for the disability that would have resulted from the accident had the earlier injury or infirmity not existed."
§ 25-5-58. However, the statute has long been construed to permit such apportionment only when the preexisting condition or infirmity prevented the employee from performing the duties of his or her employment before the work-related accident *916 or injury. See Francis Powell Enters., Inc. v. Andrews, 21 So.3d 726 (Ala.Civ. App.2009).
As we explained in Francis Powell:
"In a long line of cases beginning with Ingalls Shipbuilding Corp. v. Cahela, 251 Ala. 163, 36 So.2d 513 (1948) (superseded on other grounds by statute, see Tit. 26, § 262(a), Ala.Code 1940), Alabama appellate courts have held that `"the term ... infirmity in [§ 25-5-58] refer[s] to a condition which affects [the plaintiff's] ability to work as a normal man at the time of the accident or which would probably so affect him within the compensable period."' Ex parte Lewis, 469 So.2d 599, 601 (Ala.1985) (quoting Cahela, 251 Ala. at 173, 36 So.2d at 521). Pursuant to Cahela,

"`the law presumes that there is no preexisting injury or infirmity when the employee is able to fully perform his or her job duties in a normal manner prior to the subject injury. [Section 25-5-58] only applies when the previous injury or infirmity has demonstrated itself as disabling and prevented the employee from earning wages in a normal manner.'
"1 Terry A. Moore, Alabama Workers' Compensation § 16.25 at 708-09 (1998) (emphasis added; footnote omitted)."
Francis Powell, 21 So.3d at 736.
Grace testified that he had performed the duties of a forklift operator before his accident. No evidence in the record indicates that Grace's preexisting degenerative disk disease, bone spurs, or arthritis affected his ability to perform the essential functions of his job as a forklift operator. Grace argues, therefore, that the trial court erred by adopting the 7% physical-impairment rating assigned by Dr. Crotwell based solely on the disability resulting from the work-related accident.
Standard argues that the trial court could have considered all the evidence of record and concluded that Grace's rotator-cuff tear was not a result of his work-related accident and therefore that the 7% physical-impairment rating the trial court assigned was based on a 6% physical-impairment rating as a result of Grace's neck conditions combined with a 1% physical-impairment rating based on the labrum tear Grace suffered. Although we agree with Standard that a trial court is not bound by the physical-impairment rating assigned by the attending physician and that the trial court may make its own determination of disability based on its view of the evidence and its own observations of the employee, see Glidewell, 685 So.2d at 741, we cannot agree that the trial court in the present case happened to assign the exact physical-impairment rating assigned by Dr. Crotwell by using a different analysis of the evidence. In fact, the trial court's specific factual findings belie any such analysis on the part of the trial court. The trial court specifically stated that Grace's neck condition resulted in a physical-impairment rating of 6% but that 4% of the physical impairment was the result of preexisting conditions. The trial court then stated that the physical-impairment rating for Grace's work-related neck injury was 2%. Although the trial court's judgment did not specifically outline its findings regarding the physical-impairment rating for Grace's work-related shoulder injury, the only percentage of physical impairment the trial court could have assigned to the shoulder injury is 5%, the same physical-impairment rating Dr. Crotwell assigned to Grace's shoulder injury as a result of Grace's work-related accident. Cf. id. at 741 (noting that the trial court stated in its judgment that it had based its physical-impairment-rating determination on its own observations).
*917 Dr. Crotwell testified that his 2% and 5% physical-impairment ratings to the body as a whole as a result of the neck and shoulder injuries, respectively, were based solely on Grace's work-related injury. Dr. Crotwell explained that, including the preexisting conditions, Grace's physical-impairment rating to the body as a whole would be 14%. Discounting Grace's physical-impairment ratings for the preexisting conditions, Dr. Crotwell assigned the exact physical-impairment ratings adopted by the trial court. Thus, the trial court adopted physical-impairment ratings that excluded from consideration preexisting conditions that had not affected Grace's ability to perform his position as a forklift operator. By doing so, the trial court improperly applied § 25-5-58 by apportioning Grace's disability rating despite the fact that he was able to perform, without any limitations, all the duties of his position as a forklift operator before the work-related accident that led to his surgery and disability. See Francis Powell, 21 So.3d at 736 (quoting T. Moore, supra, at § 16.25). We therefore reverse the trial court's judgment insofar as it determined Grace's disability rating based on an apportionment between his preexisting conditions and the effects of his work-related injuries.
Grace's final argument on appeal concerns the trial court's statement in its judgment that "judgment is entered in favor of [Standard]." Grace argues that, by entering judgment in favor of Standard, the trial court is "attempt[ing] to prevent [Grace] from recovering litigation expenses as costs taxed against [Standard]." Standard argues, among other things, that the issue of costs has not been addressed by the trial court. Because Grace presents no authority in support of this argument, in violation of Rule 28(a)(10), Ala. R.App. P., we will not consider the issue further. Asam v. Devereaux, 686 So.2d 1222, 1224 (Ala.Civ.App.1996) (stating that "[t]his court will address only those issues properly presented and for which supporting authority has been cited"). We note that "[t]he assessment of costs is merely incidental to the judgment and may be done at any time prior to issuance of execution." Littleton v. Gold Kist, Inc., 480 So.2d 1236, 1238 (Ala.Civ.App.1985).
In conclusion, we affirm the trial court's judgment insofar as it concluded that § 25-5-57(a)(3)i. applied to prohibit Grace from presenting evidence of vocational disability. We also affirm the trial court's judgment insofar as it stated that judgment was entered in favor of Standard. However, we reverse that portion of the trial court's judgment assigning Grace a 7% physical-impairment rating, and we remand the cause for the trial court to determine Grace's physical-impairment rating without apportionment between Grace's preexisting conditions and those injuries resulting from his work-related accident.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
PITTMAN, BRYAN, THOMAS, and MOORE, JJ., concur.
THOMPSON, P.J., concurs in part and concurs in the result.
THOMPSON, Presiding Judge, concurring in part and concurring in the result.
The main opinion, without invitation from either party, overrules controlling precedent relative to the interpretation and application of § 25-5-57(a)(3)i., Ala. Code 1975 ("the return-to-work statute"). Because I conclude that overruling that precedent is not necessary to a proper disposition of the appeal, I concur only in the result as to that issue.
As the main opinion notes, Joseph Grace argues that the return-to-work statute creates *918 a presumption that an employee who returns to work at a wage equal to or greater than his or her pre-injury wage has not suffered a loss of earning capacity, but that this presumption is rebuttable, so that, in the proper case, an employee can show that he or she has lost earning capacity despite having returned to work at a wage equal to or greater than his or her pre-injury wage. Grace's argument is based on this court's decisions in Lanthrip v. Wal-Mart Stores, Inc., 864 So.2d 1079 (Ala.Civ.App.2002); Pemco Aeroplex v. Moore, 775 So.2d 215 (Ala.Civ.App.1999); and Discovery Zone v. Waters, 753 So.2d 515 (Ala.Civ.App.1999). My review of the record leads me to conclude that, applying the above-noted decisions, the trial court could have found that Grace did not, in fact, rebut the presumption identified in those cases and, as a result, that the trial court did not err in failing to consider any lost earning capacity on Grace's part in awarding compensation. The main opinion reaches the same conclusion, i.e., that the trial court did not err in failing to consider Grace's lost earning capacity, if any, but it does so by rejecting the controlling precedents on this issue.
Recently, our supreme court stated that "`[s]tare decisis commands, at a minimum, a degree of respect from this Court that makes it disinclined to overrule controlling precedent when it is not invited to do so.'" Ex parte Carlisle, 26 So.3d 1202, 1207 n. 2 (Ala.2009) (quoting Moore v. Prudential Residential Servs. Ltd. P'ship, 849 So.2d 914, 926 (Ala.2002)). The main opinion fails to apply this maxim and, instead, simply determines to right a perceived wrong in our prior interpretation of the return-to-work statute of which no one in this case has complained. To the extent the main opinion, sua sponte, embarks on this new direction with regard to the interpretation of the return-to-work statute, I concur only in the result the main opinion ultimately reaches. As to the other issues presented on appeal, however, I concur fully in the main opinion.
NOTES
[1] On September 14, 2009, after our opinion in Grace was issued but before this court entered its certificate of judgment, the trial court entered a judgment containing findings of fact and conclusions of law. Because the trial court lacked jurisdiction to enter its September 14, 2009, judgment, see Ex parte Tionqson, 765 So.2d 643, 643 (Ala.2000), and Veteto v. Yocum, 792 So.2d 1117, 1118-19 (Ala.Civ.App.2001), we reinvested the trial court with jurisdiction to reenter that judgment, which the trial court did on June 16, 2010.
[2] Under the return-to-work statute, an employee may later petition for an adjustment of his or her compensation based on loss of earning capacity if the employee loses his or her employment for one of the reasons enumerated in the statute. See Ala.Code 1975, § 25-5-57(a)(3)i. (i) thru (v). However, that situation does not apply to this case.