PITTMAN, Judge.
■ Lillie Billingsley (“the..employee”) appeals from a judgment of the Etowah Circuit Court, rendered and entered after an ore tenus proceeding, determining that the employee has suffered a 25% impairment of her left shoulder as a result of an injury stemming from an August 11, 2008, automobile collision arising out of and in the course of her employment with the City of Gadsden (“the employer”) and that that impairment warranted ah award of benefits under the Alabama Workers’ Compensation Act, Ala.Code-1975, § 25-5-1 et seq. (“the Act”). The employee claimed, in her June 2010 complaint, that she had suffered *740 “injuries to her [rjibs, back, legs, headaches [sic], [and] shoulder,” as well as suffering a “closed head injury”- and from “post traumatic stress syndrome,” and she asserts on appeal that the trial court erred in having sustained her claim as to only her left shoulder and in awarding permanent-partial-disability benefits based solely upon its 25% physical-impairment rating as to her shoulder.
The trial court’s judgment contains the following pertinent findings of fact and conclusions of law in compliance with Ala. Code 1975, § 25-5^88:
“1. This is a workers compensation claim arising out of an accident of August 11, 2008, while the [employee] was employed by [the employer] as a DART [ie., demand and response transit] driver.
[[Image here]]
“4. The AWW [ie., average weekly wage] for [the employee] is $211.69.
“5. The [employer] has paid temporary total disability benefits for 12.4 weeks in the sum of $194.00 per week.
“6. The MMI [ie., maximum medical improvement] date as to the lumbar back claim is November 14, 2008.
“7. The [employee] has been on Social Security Disability since 1995, as a result of fibromyalgia, perhaps among other things.
“8. [The employee’s] claim for a left shoulder injury has not been recognized or accepted by the [employer] as arising out of and in the course of her employment on August 11,2008.
“9. [The employee] worked part time for the [employer] in a job that would not compromise her Social Security Disability [benefits].
“10. The evidence indicates [the employee] is taking care of her granddaughter on a regular basis.
“11. [The employee’s] date of birth is July 25,1962.
“12. The date of the accident made the basis of this suit is August 11, 2008 and on August 12, 2008, [the employee] was seen by Michael K. Morris, D.O., who at the time was working for River-view Physical Medicine, and was the screener for the [employer],
“13.In his medical records, Dr. Morris describes that [the employee] was involved in a motor vehicle accident [and was] seen in the emergency room at Riverview Regional Medical Center and released.
“When Morris saw [the employee], she was reporting moderate pain and muscle tightness in the mid-track and low back. There was no radiation of the pain. [The employee] described no problems with neck, bilateral shoulders, or bilateral upper extremities. Morris note[d] in his record that [the employee’s] bilateral upper extremities[ ] and bilateral hips [were] within normal limits with full range of motion. The diagnosis was lumbar strain, thoracic strain, rib chest wall contusion, and muscle spasm.
“14. On August 12, 2008, [the employee] came in to see Dr. Morris again and continued to complain about pain in the right flank, right ribs and lower back. The primary complaint on August 12, 2008 was headache. The [employee was] described by Morris as in no apparent acute distress.
“15. [The employee] continued] to follow with Morris and [was] referred to Dr. Gordon Kirschberg on August 28, 2008. Dr. Kirschberg mentioned] a history of severe neck pain with radiation into the left shoulder and also lower rib pain incidental to her radiation into the left shoulder. Incidentally, according to Kirschberg,. the rib x-rays seem to show an old right lower rib fracture.
*741 “16. Dr. Morris state[d] in his note that on exam the [employee] flinehe[d] when even approached, let alone being touched with light.touch, and yet allowed] a normal range of motion of the neck and no evidence of muscle spasm,
“17. Kirschberg’s impression according to his note [was] demonstrable organic findings in the [employee]. 'For example, there [was] give-way weakness and a discrepancy between straight .leg raising, sitting and standing up. Nevertheless, Kirschberg order[ed] an MRI [magnetic-resonance image] of the brain and cervical spine and an EEG [electroencephalogram] for complete coverage. The EEG and MRI studies [were] normal and Kirschberg mentioned] that he [was] unable to find any neurological abnormality.
“18. [The employee went] back to see Morris on October 31, 2008. On October 31, 2008, [the employee reported] pain in her left shoulder, among other places. [The employee] had not participated in physical therapy since the date of her injury.
“19. On November 10, 2008, Morris referred] the [employee] -for several studies, including an MRI of left shoulder.
“20. On November 11, 2008, Dr. Sparks [sic — Morris] [indicated that] an MRI of the left shoulder [showed] significant sub acromial impingement with thickening and increased signal within the rotator cuff.
“21. On November 14, 2008, Dr. Morris commenced] on the [employee’s] left shoulder pain:. ‘Regarding her left shoulder pain, we have no .documentation of left shoulder complaints in this office until she returns for her visit on .October 31, 2008. The MRI findings at her left shoulder are significant enough that she would have reported them prior to our October 31, 2008, visit. She will need surgical evaluation regarding the findings at her left shoulder.’ The left shoulder claim was denied by the [employer].
“22. The [employee] worked in the nutritional department for the [employer] until August 14, 2009, when she left [her] employment_
“23.' On September 14, 2009, [the employee went] to Dierick Sparks, M.D., reporting an injury to her left shoulder sustained on August 11,2008. Sparks is a non-authorized treating physician and [the employee] was sketchy on the details, according to Spark[s]’s records, of whether she was involved in any litigation or workers[’] comp[.] claim.
“24. Sparks follow[ed the employee] and ultimately operate[d] on her left shoulder about two years after the date of the accident. The' surgery date was October 30, 2009. [The employee] had a left shoulder rotator cuff tear. There is no medical evidence iri this case that supports the proposition that any rota-tor cuff repair on the- left is associated with the accident made the basis of this suit. Spark[s]’s deposition was never taken in the case. After the surgery on her left shoulder, [the" employee] was uncooperative with Sparks. For example, she failed to show up for PT [physical therapy] on a regular basis. Sparks did not charge for the surgery under the ... Act.
“26. Meanwhile, on' November 3, 2009, [the employee began] to see Dr. [Huma]: Khusro, a psychiatrist, providing a history of anxiety and depression. [The employee] added that she ha[d] had depression off and on for a long time, but she pin[ned] the latest episode on the accident made the basis' of this suit. Khusro is a non-authorized treating workers’] comp[.] physician-, and *742 whatever charges were made were covered in some- other way.
“26. Khusro [took] a history from the [employee] of fibromyalgia,' ejection x 2 [two Cesarian childbirths], and left arm surgery. [The employee told] Khusro she ha[d] been on disability since 1992 and [gave] a family history of her father committing suicide when he was in his 20s when [she] was 7 years old. •
“In '... Khusro’s note of December 16, 2009, the [employee] is described as feeling anxious and scared but not appearing to be anxious or. fearful. In fact, [the employee] is noted to be in the waiting room constantly laughing and talking. [The employee] was upset because the woman who was helping her[ ] robbed, her and stole her money and prescriptions. ...
“... Khusro’s [January 27, 2010,] note mentioned] that [the employee did] not have a car because her son [had] it, ‘and this has made her mad.’ In the same note, the [employee’s] husband is described as [a] person who □comes in and out.’ ... [T]he Khusro note of July 14, 2010, [indicates that the employee told .Khusro that] she ha[d] not sued anybody but ha[d] an attorney to help pay her medical bills,, etc.. In the September 15, 2010, note Khusro state[d] that [the-employee] add[ed] that she [could not] even walk [but that the employee had appeared] to ambulate without problems. [The . employee] also reported being on SSD [ie., Social Security Disability], but not involved in, litigation. Two months later, [the employee mentioned] to Dr. Dierick Sparksf] that she is ■ involved .in a workers’] comp[.] claim against the [employer],
“27.. On November 16, 2009, Dr. Sparks reiterated to [the employee] that physical therapy was important (she had not made it to thex-apy yet, because of personal issues). ■
“28.' While the [employee] continues more currently to see Khusro, she has a history of being treated by people at CED Mental Health Center — In fact, [the employee] was seen by CED Mental Health from 1994 to 1998. [The employee described] various problems at CED Mental Health, including constant pain, panic ■ attacks, agoraphobia[;] in other words, she has a history of complaining about the same problems with CED Mental Health as she has ... with Khusro.
“On December 12, 1996, the [employee] reported] she was in a motor vehicle accident on November 19, 1996, and NEO [Northeast Orthopedic Clinic, P.C.,] records reflect that she 'complained of pain 'and weakness and state[d] that she [was] unable to raise her left arm over her head. The problems -with her-shoulder [were] described as persistente, yet] she [did] not participate in PT or have surgery, notwithstanding that NEO records reflect that the [employee] returned for evaluation of her shoulder on April. 14,1997, saying her left shoulder [was] worse and worse and she would like to have something done about it— Danny R. Sparks, M.D., ... records in 1997 [state as follows]:
“‘[The employee] returns today for evaluation of her shoulder [left]. This is a lady who had neck and shoulder pain following an automobile accident. She is doing well as far as her neck is concerned. Really having no problems at all with that. However, she is having persistent problems with pain in her shoulder. She really can’t raise it up. without having pain. It keeps her up at night as well. Pain is in the shoulder. It does not radiate into the *743 left upper extremity.... Tenderness about the left shoulder with palpation. She has positive impingement signs with abduction, forward flexion and internal rotation.' . She has pain -with resisted abduction.- Neurologic status of the left upper -extremity ■ is completely intact motor and sensory as well as deep tendon reflexes.. Unfortunately, we .are not able to get her into a. PT program. I really thought she had been going, but apparently she has not. I think we need to move on with that. I do think an injection would help.’
“In the past, the [employee] had received injections into her left, shoulder and she [was] described as ready to have something ‘done about it now.’ At the time, in 1997, the [employee] demonstrated positive impingement signs and a rotator cuff [procedure] was planned if an injection was not effective, but the [employee did] not return to NEO or Dr. Sparks until about July 19, 2004, reporting an automobile accident in which she was injured on June 25, 2004. There is no record of [the employee] getting her left shoulder fixed.
“29. The motor vehicle accident in which the [employee] apparently originally injured her left shoulder was [in] November[ ] 1996. , She was immediately complaining about her shoulder[ ] after the accident.
“30. On April 14, 1997, Danny R, Sparks, M.D., state[d] [that the employee was] ‘ready , to have done something about it now.’ ...
“31. The [employer] has a subrogation interest of $15,540.56 in [the employee’s] third party settlement for $40,000.00. '
“32. The [employee had] a varied work, history up until the time she [went] on SSI [ie., Supplemental Security Income] in about 1995. She draws a check for $740.00 per month at this point from the Social Security Administration, [The employee] has worked in the chicken business, [in] fast foods, [for] Wal-mart, and as a cook in various'places. At the time of the injury ,.. she was a seasonal employee [for the employer].

“CONCLUSIONS OF LAW

[[Image here]]
“34. The Court finds that the left shoulder claim only arises out of [the employee’s] employment.
“35. The [employee] has a 25% impairment rating to the left shoulder as a result of the accident made the basis of this suit.

“JUDGMENT

“36. The Court ... enters a judgment in favor of the [employee].
“37. The [employee] is awarded a judgment as follows: $211.69 x 66.67% = $141.13 (minimum is $194.00) x 25% = $48.50 x 285.887 weeks (12.4 TTD [ie., temporary total disability] paid; 208 accrued 79.6 future (76.3887)) = $13,841.35. Future medical[ ] [benefits] remain open, per the ... Act.” '
We note that the trial court’s judgment is subject to the following standard of review:
“The .,. Act ... provides that ‘[i]n reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness.’ § 25-5-81(e)(l), Ala.Code 1975. Our supreme court has stated the standard of review to be employed as to a trial court’s findings of fact as follows: • ,
“‘[U]nder the applicable standard Of review, we will not reverse the trial court’s finding of fact if that finding is *744 supported by substantial evidence — if that finding is supported by “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” ’
“Ex parte Trinity Indus., Inc., 680 So.2d 262, 268-69 (Ala.1996) (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989), and citing § 12-21-12(d), Ala.Code 1975). See also § 25-5-81(e)(2), Ala. Code 1975. Further, ‘[t]he [1992 Workers’ Compensation] Act did not alter the rule that this court does not weigh the evidence before the trial court.’ Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014 (Ala.Civ.App.1995).”
Drummond Co. v. Green, 895 So.2d 977, 978 (Ala.Civ.App.2004).
Pursuant to that principle of review, “ ‘the trial court’s findings on disputed evidence in a workers’ compensation case are conclusive.’” Ex parte Golden Poultry Co., 772, So.2d 1175, 1176 (Ala.2000) (quoting Ex parte Ellenburg, 627 So.2d 398, 399 (Ala.1993)); see also Ex parte Holton, 886 So.2d 83, 84-85 (Ala.2003). Moreover, we must “consider the evidence in a light most favorable to the findings of the trial court.” Ex parte Staggs, 825 So.2d 820, 822 n. 1 (Ala.2001).
Under Alabama law,
“to establish medical causation, the employee must show, through a preponderance of the evidence, that the accident arising out of and in the course of the employment was, in fact, a contributing cause of the claimed injury.
“ ‘It is not necessary that the employment-related injury be the sole cause, or the dominant cause, of the death, so long as it was a contributing cause. If the employee suffers from a latent preexisting condition that inevitably will produce injury or death, but the employment acts on the preexisting condition to hasten the appearance of symptoms or accelerate its injurious consequences, the employment will be considered the medical cause of the resulting injury.’
“The trial court has wide discretion in reaching its findings regarding medical causation. It may interpret the evidence according to its own best judgment. A trial court may infer medical causation from circumstantial evidence indicating that, before the accident, the worker was working normally with no disabling symptoms but that, immediately afterwards, those symptoms appeared and have persisted ever since.”
Waters Bros. Contractors, Inc. v. Wimberley, 20 So.3d 125, 134 (Ala.Civ.App.2009) (citations and footnote omitted). Specifically, in Ex parte Vongsouvanh, 795 So.2d 625 (Ala.2000), it was held that the “contributing cause” standard applies to claims where the principal effect of an accident is a mental condition rather than a purely physical condition; under Vongsouvanh, the pertinent question is whether an employee’s “physical injuries were a contributing cause of [the employee’s] mental disorders.” 795 So.2d at 628.
The record in this case contains substantial evidence to the effect that the employee’s claimed injuries to parts of the body other than her left shoulder and her mental disorders alleged to have stemmed from the automobile collision were not, in fact, caused by the collision. Although the employee denied having had mental problems for an extended period, and although the employee attributed her mental conditions to the automobile collision made the basis of her action against the employer, the employer adduced evidence tending to show that the employee had been treated, *745 prescribed medicine, and counseled by mental-health professionals as to a number of symptoms, such as adjustment disorder, panic attacks, and agoraphobia, between 10 and 14 years before the collision, and the employee admitted that she had been prescribed antidepressants at the time of the collision but was not then taking them. It was within the discretion of the trial court to weigh the documented history of the employee’s mental condition more heavily than her testimony to the effect that her symptoms had arisen after the collision in determining that her psychological symptoms did not stem from the collision. Further, the record contains no evidence indicating that the injuries to the employee’s ribs, lower back, or neck reported in the immediate aftermath of the collision have not fully resolved such that they are compensable permanent injuries under the Act. Thus, as to the trial court’s determination that only the employee’s left-shoulder injury stems from the employment and is compensable as a permanent partial disability under the Act, we are constrained by the applicable standard of review to affirm that aspect of the judgment.
However, we reach a different conclusion as to the trial court’s award of benefits regarding the employee’s left-shoulder injury. A shoulder injury, contrary to the employer’s position, is not a scheduled injury under the Act. See Grace v. Standard Furniture Mfg. Co., 54 So.3d 909, 913 (Ala.Civ.App.2010) (“Because Grace suffered injuries to nonscheduled members of the body, i.e., his neck and shoulder, the compensation due him would ordinarily be based upon his loss of earning capacity.”). Under § 25-5-57(a)(3)g., Ala.Code 1975, a portion of the Act, unscheduled permanent partial disabilities are to be compensated at “66 ⅜ percent of the difference between the average weekly earnings of the worker at the time of the injury and the average weekly earnings he or she is able to earn in his or her partially disabled condition, subject to the ... maximum weekly compensation as stated in Section 25-5-68,” Ala.Code 1975. As we noted in Haney v. Union Foundry Co., 677 So.2d 784, 785-86 (Ala.Civ.App.1996), an appeal in which the appellant was represented by counsel for the employee in this case, “[t]he percentage of disability and the percentage of one’s loss of ability to earn may be different,” and “a finding of a physical disability to the body as a whole does not necessarily coincide with a loss of ability to earn.”
In this case, the trial court determined that the employee had suffered a 25% impairment to her left shoulder and purported to award permanent-partial-disability benefits under the Act based upon that figure. However, under Haney, a trial court “is required to make an express finding regarding an employee’s loss of ability to earn in cases involving a nonscheduled permanent partial disability,” and “[w]hen the trial court omits such a finding, no basis for awarding compensation exists.” 677 So.2d at 785. Although the Act as it was applied in Haney has been amended to provide that an employee’s physical impairment can provide a basis for an award of compensation when the employee returns to work at the same or a higher wage after having reached maximum, medical improvement, see Ala. Code 1975, § 25-5-57(a)(3)i., the employee ceased working for the employer in August 2009, whereas she did not reach MMI as to her left shoulder until June 2010 (as indicated by the medical records of Dr. Dier-ick Sparks and as the trial court’s award of approximately four years’ worth of permanent-partial-disability benefits confirms). Thus, in this case, as in Haney, “the trial court’s judgment simply contains no indi *746 cation regarding the effect of [an employee’s] disability on [that employee’s] ability to earn,” and, in the absence of such a finding, “ ‘there is simply no basis for an award.’ ” 677 So.2d at 785 (quoting Bentley Pontiac/Cadillac, Inc. v. Adams, 646 So.2d 155, 156 (Ala.CivApp.1994)).
For the foregoing reasons, we reverse the trial court’s judgment insofar as it awards the employee permanent-partial-disability benefits under the Act, and we remand the cause for the trial court to determine the extent, if any, to which the employee’s left-shoulder injury has affected her ability to earn income and to award the employee benefits in accordance with that determination. In all other respects, the judgment is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and THOMAS, MOORE, and DONALDSON, JJ., concur.