PER CURIAM.
Carolyn Malone appeals a June 11, 2012, judgment that awarded her workers’ compensation benefits but also allowed her employer, Steelcase, Inc. (“Steelcase”), to offset the award by certain amounts it had paid in salary to Malone after her injury. The issue presented to the court is solely one of law. Accordingly, we quote a portion of the trial court’s judgment for a recitation of the pertinent facts, as well as the trial court’s factual determinations and legal conclusions:
“This workers’ compensation action came before the Court for trial on November 30, 2011. The plaintiff, Carolyn Malone, seeks workers’ compensation benefits for a lower back injury which she alleges was caused by an accident on May 21, 2008. The defendant, Steel-case, Inc., disputes [Malone’s] claim, denies that [Malone] sustained a compen-sable injury, and avers that it is entitled to a credit or offset pursuant to Ala. Code [§] § 25-5-56 and -57 (1975), for wages and benefits paid to [Malone]. After considering [Malone’s] testimony, the testimony of the other witnesses, the medical records, and other evidence presented to the Court, the Court renders the following findings of fact, conclusions of law, and judgment entry:
“STIPULATIONS OF THE PARTIES
“1. An employer/employee relationship existed between the parties on May 21, 2008, and all times pertinent to this action.
“2. The parties are subject to the Alabama Workers’ Compensation Act [(‘the Act’), § 25-5-1 et seq., Ala.Code 1975].
“3. [Malone] has been continuously employed by [Steelcase] since May 21, 2008.
“4. [Malone] has been paid wages on a continuous basis since May 21, 2008.
“5. All medical expenses incurred by [Malone] for medical treatment related to the reported May 21, 2008, incident have been paid by [Steelcase] pursuant to Ala.Code § 25-5-56 (1975), and in accordance with Ala.Code § 25-5-77 (1975).
“6. [Malone’s] average weekly wage is $489.20.
“FINDINGS OF FACT
“1. The parties are subject to the jurisdiction and venue of this Court.
“2. [Steelcase] received notice in accordance with the Act.
“3. On May 21, 2008, [Malone] was employed in the C9000 department at Steelcase. Her job involved the attachment of small parts to panels, which were processed on an assembly line/conveyor type system. After the parts were affixed, [Malone] and a co-worker moved the panels down the line for the next stage of the process.
*642 “4. On May 21, 2008, at 10:00 a.m., [Malone] was engaged in affixing parts to 65" x 60" panels. As she and a coworker were moving a panel, the coworker dropped one end of a 65" x 60" panel as [Malone] and a co-worker were in the process of moving the panel from her work table to an adjacent conveyer belt. [Malone] experienced pain in her lower back.
“5. [Malone] gave written notice of the incident on May 29, 2008. [Malone] was referred to Occupational Health Group (‘OHG’) of Decatur for medical treatment. [Malone] was examined by Dr. Fred J. McMurty on May 29, 2008, for complaints of lower back pain. [Malone] was authorized to return to work with restrictions. [Malone] was subsequently treated conservatively at OHG.
[[Image here]]
“8. On September 24, 2008, Dr. [Cyrus] Ghavam found that [Malone] was at maximum medical improvement and authorized her to return to regular duty work. He did not assign any physical impairment.
[[Image here]]
“13. On February 15, 2010, Dr. [Keith] Anderson confirmed Dr. Gha-vam’s September 24, 2008, opinion that [Malone] is at maximum medical improvement. He assigned a permanent impairment of 10% to the body as a whole.
“14. [Malone] has maintained continuous employment at Steelcase subsequent to May 21, 2008. Her job duties were accommodated as necessary to conform with any restrictions assigned by her treating physicians. She has continued to work on a full-time basis and received her regular wage rate. Her hourly wage rate had increased to $13 per hour at the time of trial. She has not sustained any actual wage loss as a result of the áccident. She is physically capable of performing the physical duties of her current job. Her current job is a combination of functions involving a customer service job and a hinge assembly job. The job functions have been accommodated to allow [Malone] to stand and sit at various times during the day.
“15. Dr. Anderson is of the opinion, based on the history provided by [Malone], that her lower back complaints were caused by the reported accident on May 21, 2008.
“CONCLUSIONS OF LAW
“[Malone] sustained an injury to her lower back-on May 21, 2008, which arose out of and in the course of her employment. The lower back injury resulted in a permanent physical impairment of twenty five per cent (25%) to the body as a whole. Based on the average weekly wage of $489.20 per week, the compensation rate is $326.15. The weekly compensation rate is $81.54 per week ($326.15 x 25%).
“[Steelcase] is entitled to a credit/offset, on a week-by-week basis, for any compensation benefits due, for each week in which [Malone] was paid wages by [Steelcase], in accordance with Ala. Code § 25-5-57(c)(3) (1975).
“JUDGMENT ENTRY
“In accordance with the foregoing findings and conclusions, it is ORDERED AND ADJUDGED by the Court as follows:
“A. As a result of her May 21, 2008, injury, [Malone] shall have and recover a judgment against the defendant Steelcase, Inc., for permanent partial disability compensation at a weekly compensation rate of $81.54. From and after February 15, 2010, the date that Dr. Anderson determined that [Malone] was at maximum *643 medical improvement, through June 15, 2012, or a period of 122 weeks, [Malone] is entitled to receive physical impairment benefits at a rate of $81.54 per week or a total of $9,947.88, of which [her attorneys] are entitled to a fee .... [Steelcase] is entitled to a credit/offset, in the amount of $69.30 per week, for the wages paid to [Malone] each week from and after the date that she reached maximum medical improvement until such time said wages cease to be paid. If said wages cease to be paid during the 300 week period subsequent to February 15, 2010, then, and under those circumstances, [Malone] shall be entitled to receive from [Steelcase] $69.30 per week for the remainder of the 300 weeks due and owing.”
(Capitalization in original; emphasis added.)
On appeal, Malone argues that the trial court erred in awarding Steelcase a setoff or credit against the benefits it awarded her in its June 11, 2012, judgment. Malone argues that the trial court applied an incorrect interpretation of § 25-5-57(c)(3), Ala.Code 1975, in awarding Steelcase a credit or offset against the workers’ compensation award for amounts she received in salary while working for Steelcase after the date she reached maximum medical improvement (“MMI”). Steelcase argues that the trial court properly interpreted § 25 — 5—57(c)(3) in awarding it a credit for salary it paid to Malone during the benefit period. This court has allowed the Alabama Association for Justice (“AAJ”) and AFL-CIO Alabama each to file a brief as an amicus curiae. Both of the amici curiae have filed briefs in support of Malone’s position in this appeal.
We note that, in asserting their arguments before this court, the parties have stipulated that Steelcase made no accommodations to allow Malone to continue in her employment and that Malone’s job duties were within the restrictions assigned to Malone by her doctors.[1] In other words, the parties have agreed that Malone’s employment was not “sheltered employment” and that the wages Steelcase paid Malone when she returned, to work after her injury were not paid in sympathy for her injury.
The portion of the Workers’ Compensation Act (“the Act”), § 25-5-1 et seq., Ala. Code 1975, concerning setoffs or credits to be afforded an employer against a workers’ compensation award provides:
“(c) Setoff for other recovery. In calculating the amount of workers’ compensation due:
“(1) The employer may reduce or accept an assignment from an employee of the amount of benefits paid pursuant to a disability plan, retirement plan, or other plan providing for sick pay by the amount of compensation paid, if and only if the employer provided the benefits or paid for the plan or plans providing the benefits deducted.
“(2) The employee shall forfeit to the employer all compensation paid for any period to which is attributed any award of back pay either by a court, administrative agency, arbitration, or settlement, provided, however, social security payments shall not be included herein.
“(3) If an employer continues the salary of an injured employee during the benefit period or pays similar *644 compensation during the benefit period, the employer shall be allowed a setoff in weeks against the compensation owed under this article. For the purposes of this section, voluntary contributions to a Section 125-cafete-ria plan for a disability or sick pay program shall not be considered as being provided by the employer.”
§ 25-5-57(c), Ala.Code 1975.
This court has addressed the setoff provided in § 25 — 5—57(c)(3) in two cases. In City of Montgomery v. Casper, 849 So.2d 966 (Ala.Civ.App.2002), the injured worker was awarded benefits for a permanent total disability, and the employer argued, among other things, that it was entitled to a credit for salary it had paid the worker when she returned to work for half days for a period after her injury. This court held:
“Section 25-5-57(c)(3), Ala.Code 1975, provides that if an employee receives salary ‘during the benefit period ..., the employer shall be allowed a setoff in weeks against the compensation owed under this article.’ As stated above, the record contains evidence, introduced by the employee, that the employee worked half-days for five weeks and one day and that the trial court awarded workers’ compensation benefits during that period the employee was working half days. The trial court’s calculation of the benefits is incorrect. We reverse that portion of the trial court’s judgment and remand the cause for the trial court to allow the employer a setoff for the salary the employee received during that five-week-and-one-day period.”
849 So.2d at 969.
Also, in Liberty Trousers Division of Walls Industries v. Amos, 738 So.2d 1272 (Ala.Civ.App.1999), the trial court found that the worker had suffered a permanent total disability, and this court affirmed that determination. The record in that case indicated that, after receiving medical treatment for her injury, the worker had returned to work under “light-duty” restrictions. This court agreed with the employer’s argument that § 25-5-57(c)(3) authorized it to receive a setoff against the permanent-total-disability award for the amount it had paid in wages after the worker returned to work.
More recently, our supreme court mentioned § 25-5-57(c)(3) in its opinion in Fort James Operating Co. v. Stephens, 996 So.2d 833 (Ala.2008). In that case, Stephens had been allowed to return to full-duty employment with a few restrictions, but Stephens retired on November 29, 2000. The trial court awarded Stephens workers’ compensation benefits based on its determination that Stephens had suffered a 35% permanent partial disability. On appeal, Fort James disputed the trial court’s determination of the date on which Stephens had reached MMI, arguing, among other things, that Stephens had reached MMI on June 7, 1999, rather than on March 23, 2000, as determined by the trial court. Based on that argument, Fort James contended that it was entitled to a setoff under § 25-5-57(c)(3) of a total of 48 weeks for wages it had paid Stephens between June 7, 1999, and November 29, 2000, when Stephens retired. Our supreme court disagreed, concluding that the evidence supported the trial court’s determination that Stephens had reached MMI on March 23, 2000, and, therefore, that Fort James was entitled to a setoff under § 25-5-57(c)(3) only for wages it had paid to Stephens between March 23, 2000, and November 29, 2000. Fort James Operating Co. v. Stephens, 996 So.2d at 840.
Fort James Operating Co. v. Stephens, is relevant to the issue in this case because in that opinion our supreme court, in addressing the employer’s argument that it *645 was entitled to a setoff under § 25-5-57(c)(8), stated:
“Section 25-5-57(c)(3), Ala.Code 1975, provides that if an employee receives a salary ‘during the benefit period ... the employer shall be allowed a setoff in weeks against the compensation owed under this article.’ In order for an employee to receive permanent-partial or permanent-total-disability benefits, the employee must have reached MMI. Ex parte Phenix Rental Ctr., [873 So.2d 226 (Ala.2003) ].”
996 So.2d at 840 (emphasis added).
On application for rehearing, Stephens argued for the first time that the supreme court had erred in allowing Fort James the setoff under § 25-5-57(c)(3). Stephens asserted that the salary he had been paid by Fort James was not a “ ‘sympathy’ salary paid to an injured worker who is not working” and that, therefore, because he had earned his salary, no credit should be afforded under § 25 — 5—57(c)(3). 996 So.2d at 843. Our supreme court declined to address Stephens’s argument concerning the application of § 25-5-57(c)(3), concluding that Stephens had impermissibly raised the argument for the first time on application for rehearing. Id. at 843. The court stated:
“[Bjecause Stephens attempts to raise this particular argument for the first time in his application for rehearing, we cannot consider it. Because this is an important issue in the area of workers’ compensation law that does not appear to have been definitively addressed by this Court, we will await a proceeding in which this issue is both squarely before this Court for adjudication and adequately briefed.”
996 So.2d at 843-44.
Malone, unlike Stephens in Fort James, makes a timely argument on appeal that her return to work differed from that of the workers in Casper and Amos because her wages were earned through her labor and were not provided as a “sympathy salary.” However, we need not address that argument to reach our decision in this matter.
“In construing the terms of the Alabama Workers’ Compensation Act (‘the Act’), § 25-5-1 et seq., Ala.Code 1975, the courts are bound by the ordinary rules of statutory construction.” Ex parte Kish, 45 So.3d 772, 775 (Ala.Civ.App.2010). “The basic rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute.” Id.; see also Ex parte Anlcrom, [Ms. 1110176, Jan. 11, 2013] — So.3d —,— (Ala. 2013) (quoting Volkswagen of America, Inc. v. Dillard, 579 So.2d 1301, 1305 (Ala. 1991)) (“ ‘[T]he fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute. If possible, the intent of the legislature should be gathered from the language of the statute itself.’ ”).
Malone correctly points out that the Act is to be liberally construed to “effectuate the intended beneficial purposes” of the Act. Act. No. 92-537, § 1, Ala. Acts 1992; see also Haggard v. Uniroyal, Inc., 423 So.2d 865, 866 (Ala.CivApp.1982) (citing Reynolds Metals Co. v. Gray, 278 Ala. 309, 178 So.2d 87 (1965)) (same). Steelcase agrees that the Act is to be liberally construed, but it argues that the interpretation of the Act “ ‘must be one that the language of the statute “fairly and reasonably” supports.’ ” Ex parte Weaver, 871 So.2d 820, 824 (Ala.2003) (quoting Ex parte Dunlop Tire Corp., 706 So.2d 729, 733 (Ala.1997), quoting in turn Ex parte Beaver Valley Corp., 477 So.2d 408, 411 (Ala. 1985)). Both parties maintain that § 25-5-57(c)(3) is unambiguous and that the “plain meaning” of the statute warrants an interpretation in their favor. The parties *646 agree that the following rules of statutory construction apply:
“The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute. Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect. Tuscaloosa County Comm’n v. Deputy Sheriffs’ Ass’n of Tuscaloosa County, 589 So.2d 687 (Ala. 1991).”
I MED Corp. v. Systems Eng’g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992).
Malone has raised a number of arguments in her brief on appeal in support of her more general contention that the trial court erred in awarding Steelcase a setoff. Malone argues that § 25-5-57(a)(3)i., Ala. Code 1975, often referred to as “the return-to-work provision,” controls in this case to determine her compensation. The parties agree, and the trial court’s judgment demonstrates, that the trial court applied § 25-5-57(a)(3)i. in reaching its workers’ compensation judgment. Section 25-5-57(a)(3)i. provides, in pertinent part:
“Return to Work. If, on or after the date of maximum medical improvement, ... an injured worker returns to work at a wage equal to or greater than the worker’s pre-injury wage, the worker’s permanent partial disability rating shall be equal to his or her physical impairment and the court shall not consider any evidence of vocational disability.”
This court has explained the purpose of the return-to-work provision as follows:
“This court has held that the return-to-work statute creates a rebuttable presumption that an employee who returns to work earning the same or a greater wage suffered no loss of earning capacity. Lanthrip v. Wal-Mart Stores, Inc., 864 So.2d 1079, 1082 (Ala.Civ.App.2002); Perneo Aeroplex v. Moore, 775 So.2d 215 (Ala.Civ.App.1999); and Discovery Zone v. Waters, 753 So.2d 515, 517 (Ala.Civ. App.1999). In those cases, we explained that an employee may rebut the presumption by establishing that the employee truly suffers from incapacity or that the employee’s higher post-injury wages are an unreliable indicator of his or her earning capacity. See, e.g., Discovery Zone, 753 So.2d at 517 (quoting Johnson v. Alabama Power Co., 670 So.2d 39, 41-42 (Ala.Civ.App.1993)). However, in applying the return-to-work statute in Discovery Zone, Perneo Aeroplex, and Lanthrip, this court applied caselaw that predated the enactment of the statute.
“Before 1992, when the return-to-work statute was enacted, see Ala. Acts 1992, Act No. 92-537, § 17, Alabama caselaw held that, when an injured employee returned to work earning the same or higher wages, those facts raised a presumption that the employee had not sustained a loss of earning capacity, which presumption could be rebutted by evidence independently showing incapacity or explaining away the post-injury earnings as an unreliable indicator of earning capacity. See, e.g., Goodyear Tire & Rubber Co. v. Downey, 266 Ala. 344, 96 So.2d 278 (1957); and United States Steel Mining Co. v. Riddle, 627 So.2d 455 (Ala.Civ.App.1993) (applying pre-1992 law). Because caselaw allowed the presumption to be easily rebutted, injured employees routinely received compensation for loss of earning capacity despite having experienced no actual *647 wage loss. See 1 Terry A. Moore, Alabama Workers’ Compensation §§ 13:40-13:51 (1998). Apparently, the legislature concluded that the caselaw allowing employees to receive compensation based on loss of earning capacity, despite the fact that their injuries did not immediately result in reduced wages, should be superseded. In order to limit compensation in cases in which an injured employee returns to work earning the same or higher wages following a permanent nonscheduled injury, the legislature resolved that, in such cases, the employee’s degree of physical impairment, and not his or her loss of earning capacity, should be the measure for compensation. See T. Moore, supra, at § 13:51. Any reading of the return-to-work statute that restores the applicability of caselaw regarding the presumption of a loss of earning capacity created by an employee’s returning to work earning the same or higher wages would be totally inapposite to the purpose of the statute. See Ala. Acts 1992, Act No. 92-357, § 1 (requiring workers’ compensation laws to be construed to effect their purposes).
“The return-to-work statute does not create any presumption that an employee has not sustained a loss of earning capacity. Rather, the return-to-work statute conclusively states that, when an employee returns to work after reaching maximum medical improvement and the employee is earning the same or higher wages, loss of earning capacity shall not be considered in assessing the compensation due the employee for any permanent disability.[2] Upon concluding that the return-to-work statute governs the amount of compensation due, a trial court need not undergo any analysis to determine whether an employee’s post-maximum-medical-improvement earnings reliably indicate the earning capacity of the employee because earning capacity is not even at issue. To the extent that Discovery Zone, Perneo Aeroplex, and Lanthrip construe the return-to-work statute incorrectly by applying pre-statute caselaw indicating that a return to work at the same or a higher wage creates only a presumption that the employee has suffered no loss of earning capacity, those cases are overruled.
[[Image here]]
“[2]Under the return-to-work statute, an employee may later petition for an adjustment of his or her compensation based on loss of earning capacity if the employee loses his or her employment for one of the reasons enumerated in the statute. See Ala.Code 1975, § 25-5-57(a)(3)i.(i) [through] (v). However, that situation does not apply to this case.”
Grace v. Standard Furniture Mfg. Co., 54 So.3d 909, 913-14 (Ala.Civ.App.2010).
Malone argues that § 25-5-57(a)(3)i. controls the determination of her award of permanent-partial-disability benefits because that provision is more specific than § 25-5-57(c)(3). This court has explained:
“ ‘Statutes should be construed together so as to harmonize the provisions as far as practical.’ Ex parte Jones Mfg. Co., 589 So.2d 208, 211 (Ala.1991). ‘In the event of a conflict between two statutes, a specific statute relating to a specific subject is regarded as an exception to, and will prevail over, a general statute relating to a broad subject.’ Id.”
Alabama Dep’t of Revenue v. National Peanut Festival Ass’n, 11 So.3d 821, 829-30 (Ala.Civ.App.2008). See also Crawford v. Springle, 631 So.2d 880, 882 (Ala.1993) (“Where statutes in pari materia are general and specific, the more specific statute controls the more general statute.”); Bald *648 win Cnty. v. Jenkins, 494 So.2d 584, 588 (Ala.1986) (“Where two statutes are related to the same subject and embrace the same matter, a specific or particular provision is controlling over a general provision.”); State v. Franklin Cnty. Coop., Inc., 464 So.2d 120, 123 (Ala.Civ.App.1985) (“A specific provision of a statute is controlling over a more general provision in the same statute.”); and Green v. Fairfield City Bd. of Educ., 365 So.2d 1217, 1220 (Ala. Civ.App.1978) (“[A] specific or particular provision is controlling over a general provision.”).
Malone also points out that § 25-5-57(a)(3)i. is rendered meaningless under the interpretation of § 25-5-57(c)(3) advocated by Steelcase and adopted by the trial court in this case. See Ex parte Children’s Hosp. of Alabama, 721 So.2d 184, 191 (Ala.1998) (“ ‘ “There is a presumption that every word, sentence, or provision [of a statute] was intended for some useful purpose, has some force and effect, and that some effect is to be given to each, and also that no superfluous words or provisions were used.” ’ ”).
The legislature enacted § 25-5-57(a)(3)i. to supersede the law regulating the amount of permanent-partial-disability compensation owed to an employee who, upon reaching MMI, returns to work making the same or higher wages. See Grace v. Standard Furniture Mfg. Co., 54 So.3d at 913. The legislature recognized that judicial construction of the part of the Act addressing permanent partial disability had allowed many employees to recover permanent-partial-disability benefits for loss of earning capacity even though those employees would not experience any actual wage loss during the 300-week permanent-partial-disability period. See 1 Terry A. Moore, Alabama Workers’ Compensation §§ 13:40-13:51 (West 1998). To avoid that situation, the legislature resolved that injured employees who have returned to work making the same or higher wages would no longer receive benefits based on “vocational disability,” or loss of earning capacity, but would be limited to permanent-partial-disability benefits as measured by their “physical impairment.” See Grace, supra.
“Physical-impairment” benefits under the return-to-work statute are analogous to benefits for loss, or loss of use, of a scheduled member, which do not depend in any manner on an employee’s wage loss or impairment of earning capacity. See Leach Mfg. Co. v. Puckett, 284 Ala. 209, 224 S®.2d 242 (1969). Those benefits, like scheduled benefits, should be payable based on the physical disability to the body, regardless of whether an employee is receiving full wages during the benefit period. Id. The payment of full wages may reflect that an employee has not sustained any loss of earning capacity, but the legislature has specifically provided in the return-to-work statute that the court shall not consider that evidence, which relates solely to the degree of “vocational disability.”
Notably, the legislature could have drafted the return-to-work statute to completely eliminate any right to permanent-partial-disability benefits until actual wage loss occurs. See T. Moore, supra, at § 13:54. However, the legislature evidently decided that an employee with a permanent physical impairment not otherwise covered by the schedule “should receive some remedy in return for sacrificing the right to sue the employer for common-law damages.” Id. That remedy would be completely eradicated if § 25-5-57(c)(3) applied to cases in which an employee has returned to the employment in which he or she was injured and earns the same or higher wages. Under such circumstances, an employee would never receive physical-impairment benefits because his or her *649 compensation would always be completely offset by the salary credit. In assessing the physical impairment of an employee, the court would be undertaking a futile hypothetical exercise. Compensation would be payable only if and when an employee lost his or her employment (for reasons not enumerated in the return-to-work statute) and suffered an actual wage loss, and, at that point, the return-to-work statute provides, compensation would not be based on physical impairment, but on loss of earning capacity.[2] The legislature obviously did not intend that the physical-impairment benefits available under the return-to-work statute would not be payable to an employee under such circumstances.
A more rational conclusion is that the legislature intended the return-to-work statute as a comprehensive and exclusive scheme to control the method for determining the amount of compensation due an employee who has returned to work making the same or higher wages after reaching MMI. Accordingly, we hold that the legislature did not intend that § 25-5-57(c)(3) would apply in situations covered by the return-to-work statute but that the two statutes have separate fields of operation. Viewing the language of § 25 — 5—57(c)(3) in isolation, it is understandable that the trial court applied the salary credit to this case. However, applying that language to this fact scenario produces an irreconcilable conflict between § 25-5-57(c)(3) and the return-to-work statute, depriving the latter of any effect. In such situations, the court must apply the more specific statute, not the more *650 general statute. See Alabama Dep’t of Revenue v. National Peanut Festival Ass’n, 11 So.3d at 829-30. Because the trial court applied § 25-5-57(c)(3) to offset the award of physical-impairment benefits due Malone under the return-to-work statute, its judgment is due to be reversed and the case remanded for the entry of a new judgment omitting any setoff.
Accordingly, we reverse the judgment and remand the case for the trial court to enter a judgment in compliance with this opinion. The remaining arguments asserted by the parties are pretermitted.
REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN, THOMAS, and DONALDSON, JJ., concur.
MOORE, J., concurs in the result, without writing.

. Given the parties’ stipulation on this issue, we disregard the finding in the judgment that Malone's "job duties were accommodated as necessary to conform with any restrictions assigned by her treating physicians."

. After its first sentence, which is quoted, in part, earlier in this opinion, § 25 — 5—57(a)(3)i. provides, in part:
"Notwithstanding the foregoing, if the employee has lost his or her employment under circumstances other than any of the following within a period of time not to exceed 300 weeks from the date of injury, an employee may petition a court within two years thereof for reconsideration of his or her permanent partial disability rating:
"(i) The loss of employment is due to a labor dispute still in active progress in the establishment in which he or she is or was last employed. For the purposes of this section only, the term 'labor dispute' includes any controversy concerning terms, tenure, or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee. This definition shall not relate to a dispute between an individual worker and his or her employer.
"(ii) The loss of employment is voluntary, without good cause connected with such work.
"(iii) The loss of employment is for a dishonest or criminal act committed in connection with his or her work, for sabotage, or an act endangering the safety of others.
"(iv) The loss of employment is for actual or threatened misconduct committed in connection with his or her work after previous warning to the employee.
"(v) The loss of employment is because a license, certificate, permit, bond, or surety which is necessary for the performance of such employment and which he or she is responsible to supply has been revoked, suspended, or otherwise become lost to him or her for a cause.
"The burden of proof is on the employer to prove, by clear and convincing evidence, that an employee’s loss of employment was due to one of the causes (i) through (v) above. At the hearing, the court may consider evidence as to the earnings the employee is or may be able to earn in his or her partially disabled condition, and may consider any evidence of, vocational disability. The fact the employee had returned to work prior to his or her loss of employment shall not constitute a presumption of no vocational impairment....”